UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED
DEC 1 3 2023
ROBERT KIRSCH
U.S. DISTRICT JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon.    Robert Kirsch |
| v. | : | Crim. No.  23-CR-1053 |
| BORUCH DRILLMAN, a/k/a "BARRY DRILLMAN" | : : | 18 U.S.C. § 371 18 U.S.C. § 1343 |

# INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States charges:

(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)

## Background and Relevant Parties

1.  At all times relevant to this Information:

    a.  The defendant, Boruch Drillman, a/k/a "Barry Drillman," was a resident of New York, New York.

    b.  Troy Technology Park was a commercial office complex in Troy, Michigan. Troy Technology Park was owned by Troy Technology Holdings LLC, which was managed by defendant Drillman.

    c.  Williamsburg of Cincinnati was an apartment complex in Cincinnati, Ohio. Williamsburg of Cincinnati was purchased in March 2019 by BRC Williamsburg Holdings LLC, which was managed by defendant Drillman.

    d.  The Federal National Mortgage Association, known as "Fannie Mae," was a government-sponsored enterprise formed by the United States Congress. Among other purposes, Congress formed Fannie Mae to purchase mortgages,

including for multi-family properties, to increase the amount of money available in the mortgage lending market. Fannie Mae worked with certain approved financial institutions that issued loans, sold loans to Fannie Mae, and serviced loans on behalf of Fannie Mae.

  e. "Financial Institution 1" was a financial institution as defined by 18 U.S.C. § 20, with headquarters in New York, New York.

  f. "Financial Institution 2" was a commercial real estate financing company with its U.S. headquarters in Chicago, Illinois. Financial Institution 2 also was a financial institution as defined by 18 U.S.C. § 20 and was approved to sell and service loans on behalf of Fannie Mae.

  g. Financial Institution 1 issued a mortgage loan to Troy Technology Park. Financial Institution 2 issued a mortgage loan to BRC Williamsburg Holdings. Defendant Drillman was listed as the guarantor for both mortgages.

  h. Riverside Abstract ("Riverside") was a title company with offices in Lakewood, New Jersey.

  i. Madison Title Agency ("Madison") was a title company with offices in Lakewood, New Jersey.

  j. Apex Equity Group ("Apex") was a privately held real estate investment and advisory firm that was based in Newark, New Jersey.

  k. Rhodium Capital Advisors, LLC ("Rhodium") was a real estate investment firm with a registered address in New York, New York.

  l. "Co-Conspirator 1" was an employee of Apex and the father of Co-Conspirator 2.

   m. "Co-Conspirator 2" was an employee of Apex and the son of Co-Conspirator 1.

   n. "Co-Conspirator 3" was a managing member of Rhodium.

   o. "Co-Conspirator 4" was a managing member of Rhodium and a notary in the state of New Jersey.

   p. Individual 1 was the founder and CEO of Aandar Real Estate Capital, which was based in Rochelle Park, New Jersey.

   q. An "arm's length" transaction was one where the buyer of a property did not have a preexisting familial or business relationship with the seller.

   r. A Purchase and Sale Agreement ("PSA") was a document that was written and signed after a buyer and seller mutually agreed on the price and terms of a real estate transaction.

   s. A Letter of Intent ("LOI") was a document that outlined the terms of a potential sale of a property and served as an "agreement to agree" between two parties.

### Commercial Property Mortgage Lending Process

   2. When a real estate developer or "sponsor" identified a commercial property they were interested in purchasing, the sponsor or their broker typically reached out to the current owner and sent an LOI outlining their interest in the property, potential sales price, and sponsor due diligence. If the current owner (*i.e.*, the seller) agreed to the terms, the sponsor and seller would enter into a PSA outlining in greater detail the specifics of the sale transaction.

3

3. Around the same time of the LOI or PSA, the sponsor would seek financing for the transaction. Financing a commercial property generally involved loans with seven- to ten-year terms, with balloon payments at the end of the term. At the expiration of a term, when the balloon payment was due, borrowers often refinanced the loan to satisfy the balloon payment and any other outstanding debts. Lenders generally would only lend up to approximately eighty percent of the value of the property. Lenders typically required a borrower to fund the remaining twenty percent equity requirement with cash, so the sponsor had a financial stake in the property's future value and performance.

4. Financial institutions that were considering issuing a loan on a commercial property evaluated several factors to determine whether to make the loan, including, among other considerations, the value of the property. To determine the value of the property, the lender typically would hire an appraiser.

5. Appraisers assumed the PSA was an arm's length transaction, and typically an appraiser would value the property at or close to the purchase amount in the PSA.

## The Conspiracy

6. From at least as early as in or about 2018, through in or about 2020, in the District of New Jersey, and elsewhere, the defendant

BORUCH DRILLMAN,
a/k/a "BARRY DRILLMAN"

did knowingly and willfully conspire and agree with others to commit an offense against the United States, namely, wire fraud affecting a financial institution, that is, to knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud Financial Institution 1, Financial Institution 2, and Fannie Mae, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and, for the purposed of executing such scheme and artifice to defraud, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, affecting one or more financial institutions, contrary to Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

7. It was an object of the conspiracy to induce Financial Institution 1 to issue a mortgage loan to Troy Technology Holdings LLC, an entity managed by defendant Drillman, based on false pretenses, representations, and promises.

8. It was further an object of the conspiracy to obtain a loan on Troy Technology Park in an amount greater than Troy Technology Holdings LLC would have qualified for and to enrich defendant Drillman and his co-conspirators with the

5

inflated loan proceeds generated by the fraudulently obtained loan.

9. It was further an object of the conspiracy both to induce Financial Institution 2 to issue a mortgage loan to BRC Williamsburg Holdings, LLC, an entity managed by defendant Drillman, and to induce Fannie Mae to fund or purchase that mortgage loan, based on false pretenses, representations, and promises.

10. It was further an object of the conspiracy to obtain a loan on Williamsburg of Cincinnati in an amount greater than BRC Williamsburg Holdings would have qualified for and to enrich defendant Drillman and his co-conspirators with the inflated loan proceeds generated by the fraudulently obtained loan.

### Manner and Means of the Conspiracy

*Troy Technology Park Transaction*

11. It was part of the conspiracy that conspirators engaged in a "flip" transaction, in which the conspirators used a related party to purchase Troy Technology Park for $42,700,000 before selling or flipping the property to defendant Drillman for $70,000,000. The $70,000,000 purchase price was falsely presented to Financial Institution 1 as the price negotiated to purchase the property at arm's length. The purchase price was a key input used by Financial Institution 1 to determine the market value of the property. Members of the conspiracy purposely misled and concealed from Financial Institution 1 the true sales price of $42,700,000.

12. It was further a part of the conspiracy, that based on the conspirators' false statements to Financial Institution 1, on or about September 25, 2020, Financial Institution 1 issued a loan to Troy Technology Holdings LLC, which was managed by defendant Drillman, in the amount of $45,000,000 for the purchase of Troy

6

Technology Park. The conspirators further misrepresented to Financial Institution 1 that this loan amount was approximately 65% of the $70,000,000 purchase price.

*Williamsburg of Cincinnati Transaction*

13. It was further a part of the conspiracy that members of the conspiracy engaged in a second "flip" transaction, in which they stole the identity of another individual, N.F., and utilized N.F.'s stolen identity to purchase the Williamsburg of Cincinnati property for $70,000,000 before selling or flipping the property to Defendant for $95,850,000. The $95,850,000 purchase price was falsely presented to Financial Institution 2 and Fannie Mae as the price negotiated to purchase the property at arm's length. The purchase price was a key input used by Financial Institution 2 and Fannie Mae to determine the market value of the property. Members of the conspiracy purposely misled and concealed the true sales price of $70,000,000.

14. It was further a part of the conspiracy that based on the conspirators' false statements, on or about March 8, 2019, Financial Institution 2 and Fannie Mae funded a loan to BRC Williamsburg Holdings LLC, which was managed by defendant Drillman, in the amount of $74,250,000 for the purchase of Williamsburg of Cincinnati apartment complex. The conspirators further misrepresented to Financial Institution 2 and Fannie Mae that this loan amount was approximately 75% of the $98,850,000 purchase price.

## Overt Acts in Furtherance of the Conspiracy

*Troy Technology Park Transaction*

15. In furtherance of the conspiracy, at least one of the conspirators committed at least one of the following overt acts, among others, in the District of New Jersey and elsewhere:

16. On or about February 25, 2020, Co-Conspirator 2 sent an email to an employee of the seller of Troy Technology Park, with an attached LOI from Apex dated on or about February 17, 2020, with an offer to purchase Troy Technology Park for $42,000,000. The letter was signed by Co-Conspirator 1 as a Managing Member of Apex.

17. On or about June 11, 2020, Individual 1 sent an email to an Executive Director at Financial Institution 1 seeking a loan for Troy Technology Park. In this email, Individual 1 stated that defendant Drillman was the sponsor who was purchasing the property for $65,000,000 and seeking a loan for $48,750,000.

18. On or about July 10, 2020, the owner of Troy Technology Park entered into an agreement with Co-Conspirator 2 to sell the property for $45,200,000.

19. On or about July 30, 2020, defendant Drillman sent an email to Individual 1 with an attachment titled "PSA Troy Technology (1).pdf"

20. On or about July 31, 2020, Individual 1 forwarded defendant Drillman's email and attachment to Financial Institution 1. The attached file was a PSA indicating Troy Technology Holdings LLC was purchasing Troy Technology Park for the purchase price of $70,000,000. This PSA listed defendant Drillman as the representative for Troy Technology Park.

21. On or about September 14, 2020, Individual 1, to justify the $70,000,000 purchase price, sent an email and attachment to Financial Institution 1. The attached file was an LOI to purchase Troy Technology Park for $68,800,000. This LOI was sent to the appraiser by Financial Institution 1.

22. To conceal the actual Troy Technology Park closing price from Financial Institution 1, members of the conspiracy arranged for two closings—one for the actual sales price ($42,700,000) and the other for the false, inflated sales price ($70,000,000). Furthermore, members of the conspiracy provided a short term one-week loan of approximately $30,000,000 to support the closing for the inflated sales price.

23. On or about September 25, 2020, the sale of Troy Technology Park was completed, in connection with Riverside performed two closings on the property, one for the seller with a contract price of $42,700,000 and one for the lender with a contract price of $70,000,000.

*Williamsburg of Cincinnati Transaction*

24. In or about November 2018, members of the conspiracy emailed the broker representing the seller of Williamsburg of Cincinnati inquiring about purchasing Williamsburg of Cincinnati.

25. On or about January 16, 2019, an employee of Rhodium sent an email to the broker purporting to represent the seller of Williamsburg of Cincinnati. The email attached an LOI to purchase Williamsburg of Cincinnati for $70,000,000, signed by Co-Conspirator 3 purporting to represent an unlisted buyer.

26. On or about January 28, 2019, the owner of Williamsburg of Cincinnati

signed a PSA to sell Williamsburg of Cincinnati for $70,000,00 with a closing date of March 8, 2019, to an individual purported to be N.F.

27.  On or about February 7, 2019, Co-Conspirator 3 and Co-Conspirator 4 caused N.F.'s signature to be placed on a PSA selling Williamsburg of Cincinnati to another conspirator for $95,850,000 with a closing date of March 8, 2019.

28.  On or about March 8, 2019, Co-Conspirator 3 and Co-Conspirator 4 caused N.F.'s signature to be placed on the Williamsburg of Cincinnati closing documents.  Co-Conspirator 4 notarized the document.  N.F. was not involved in the Williamsburg of Cincinnati transaction and did not authorize Co-Conspirator 3, Co-Conspirator 4, or anyone else to use his or her name, signature, or likeness for any real estate transaction.

29.  On or about March 8, 2019, the sale of Williamsburg of Cincinnati was completed, in connection with Madison Title performed two closings, one for the seller with a contract price of $74,500,000 and one for the lender with a contract price of $95,850,000.

30.  On or about May 7, 2019, Co-Conspirator 3 and Co-Conspirator 4 caused to be transmitted a fraudulent document giving instructions on how to distribute the approximately $25,598,500 in profit earned from the Williamsburg of Cincinnati flip transaction.  Co-Conspirator 3 and Co-Conspirator 4 caused N.F.'s signature to be placed on this document.  Co-Conspirator 4 notarized the document, and the proceeds from the sale were eventually sent to Co-Conspirator 3.

31.  Defendant Drillman, Co-Conspirator 3, and Co-Conspirator 4

intentionally misled lenders as to Co-Conspirator 3 and Co-Conspirator 4's ownership interests in the entity purchasing Williamsburg of Cincinnati.

In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1.      The allegations contained in this Information are realleged here for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.      The United States gives notice to defendant Drillman that, upon conviction of the offense charged this Information, the United States will seek forfeiture, in accordance with Title 18, United States Code, Sections 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), of any and all property, real and personal, that constitutes or was derived, directly and indirectly, from proceeds traceable to the commission of that offense,

including, but not limited to,

the sum of United States currency to be determined by the court to be evidenced by a monetary judgment issued by this Court in aforesaid amount. Said judgment will accrue at the prevailing rate per annum and serve as a judgment and lien against the defendant's property, wherever situated until fully satisfied.

3.      If by any act or omission of defendant Drillman, any of the property subject to forfeiture described above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;
(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek

12

forfeiture of any other property of defendant Drillman up to the value of the above-described forfeitable property.

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

_Siji Moore_
Siji Moore
Trial Attorney, Fraud Section
Babasijibomi.Moore2@usdoj.gov
1400 New York Ave, N.W.
Washington, D.C. 20005
Tel: 202-834-2793

_Philip R. Sellinger by AL_
PHILIP R. SELLINGER
United States Attorney

13

CASE NUMBER: _____

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

v.

**BARUCH DRILLMAN**
a/k/a "Barry Drillman"

# INFORMATION FOR

18 U.S.C. § 371

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

BABASIJIBOMI MOORE
MARTHA K. NYE
ASSISTANT U.S. ATTORNEYS